**BEALL & BURKHARDT**
WILLIAM C. BEALL, STATE BAR NO. 97100
ERIC W. BURKHARDT, STATE BAR NO. 132812
1114 STATE STREET
LA ARCADA BUILDING, SUITE 200
SANTA BARBARA, CALIFORNIA, 93101
(805) 966-6774, FAX (805) 963-5988

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy No. 9:10-bk-10689-RR |
| | ) Chapter 11 |
| DAZ Vineyards, LLC, | ) |
| | ) **MOTION FOR USE OF CASH** |
| Debtor. | ) **COLLATERAL** |
| | ) |
| | Hearing to be Set |

        Debtor-in-possession DAZ Vineyards, LLC makes its Motion for

Use of Cash Collateral as follows:

        The debtor has filed a Chapter 11 case on February 15, 2010.

The debtor owes a pre-petition obligation to with Silicon Valley

Bank.  On February 20, 2008 and March 23, 2009, Silicon Valley

Bank filed a UCC-1 financing statement and an amendment thereto

with the California Secretary of State with filing numbers

087147845044 and 0971912578 perfecting its interest in the

debtor's inventory and accounts receivable.

        In order for the debtor to continue in operation, the debtor

will need to pay ongoing expenses, including wages, purchase of

inventory and payment of utilities, among other things.  The only

realistic source of funds for the payment of the ordinary and

1

1  necessary costs of operation of the debtor's business is through

2  sale of the debtor's inventory and collection of the debtor's pre-

3  and post-petition accounts receivable.

4  The inventory and pre-petition accounts receivable are the

5  cash collateral of Silicon Valley Bank as that term is defined in

6  §363(a).  Pursuant to §363(c)(2), the debtor may only use cash

7  collateral with either the consent of the secured party or by order

8  of the Court.  Although the debtor will seek Silicon Valley Bank's

9  consent, prudence dictates the filing of this motion as an

10  alternative measure.

11  §363(c)(3) clearly provides for an expedited preliminary

12  hearing on this motion.  Pursuant to §363(e), the Court should

13  grant to the debtor the right to use the cash collateral to the

14  extent the debtor can provide adequate protection to the secured

15  creditor.

16  Here, adequate protection takes two forms.  First, Silicon

17  Valley Bank is owed approximately $326,000.00 while the value of

18  the debtor's inventory plus receivables exceeds $5,000,000.00.

19  Thus, Silicon Valley Bank is protected by the equity cushion it

20  already enjoys.  Next, the debtor requests that this Court enter

21  its Order providing a replacement lien to Silicon Valley Bank in

22  the post-petition accounts receivable which will be created by the

23  debtor in post-petition operation of its business.  The projected

24  profit and loss statement attached as Exhibit B hereto demonstrates

25  that to the best of the debtor's ability to project, the

26  receivables created by post-petition operations will exceed the use

27  of the cash collateral, which should improve Silicon Valley Bank's

28  position overall.

1      Wherefore, the debtor requests that the Court enter its order

2  permitting the debtor to use the cash collateral of Silicon Valley

3  Bank for its ordinary and necessary operating costs and providing

4  for a replacement lien to Silicon Valley Bank as adequate

5  protection for the proposed use.

6                                 Respectfully submitted,

7  Dated: _____2/15_____, 2010    BEALL & BURKHARDT

8

9                               By William C. Beall

10                               William C. Beall, Counsel for
                             DAZ Vineyards, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# DECLARATION OF JOHN ZAHOUDANIS

I, John Zahoudanis, declare and state as follows:

1.   I am the manager of DAZ Vineyards, LLC, debtor and debtor in possession herein.   Each of the matters set forth below is stated of my own personal knowledge and if called as a witness, I could competently testify to each of them.

2.   The debtor has filed a Chapter 11 case on February 15, 2010.   The debtor owes a pre-petition obligation to Silicon Valley Bank.   A copy of the Silicon Valley Bank contract is attached hereto as Exhibit A and incorporated herein by this reference.

3.   On February 20, 2008 and March 23, 2009, Silicon Valley Bank filed a UCC-1 financing statement and an amendment thereto with the California Secretary of State with filing numbers 087147845044 and 0971912578 perfecting its interest in the debtor's inventory and accounts receivable.

4.   In order for the debtor to continue in operation, the debtor will need to pay ongoing expenses, including wages, purchase of inventory and payment of utilities, among other things.   The only realistic source of funds for the payment of the ordinary and necessary costs of operation of the debtor's business is through collection of the debtor's pre-petition accounts receivable.

5.   Silicon Valley Bank is owed approximately $326,000.00 while the value of the debtor's inventory plus receivables exceeds $5,000,000.00.   A projected profit and loss statement is attached as Exhibit B hereto.   It demonstrates that to the best of the debtor's ability to project, the receivables created by post-

1   petition operations will exceed the use of the cash collateral,

2   which should improve Silicon Valley Bank's position overall.

3

4        I declare under penalty of perjury that the foregoing is true

5   and correct.

6        Dated: __2/15/10__ , 2010

7

8                                    John Zahoudanis

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# LOAN AND SECURITY AGREEMENT

### SILICON VALLEY BANK
3700 Old Redwood Highway, Suite 220
Santa Rosa, CA 95403
Facsimile (707) 579-1004

**Borrower**
DAZ Vineyards, LLC

**Borrower Address:**
6701 Foxen Canyon Road
Los Olivos, California 93441
Facsimile:

Silicon Valley Bank ("**Bank**") is pleased to extend to you the following Commitment(s).

1.     <u>Borrower</u>: DAZ Vineyards, LLC.

2.     <u>Commitment</u>:

   (a)     Line of Credit ("**LOC**"): $300,000 increasing to $850,000 line of credit at such time as Borrower deposits $500,000 as cash collateral with Bank within 60 days following the Effective Date (the "**LOC Commitment**").

   "**Commitment(s)**" refers to the LOC Commitment as the context requires.

3.     <u>Purpose</u>

   (a)     LOC Commitment:     To supplement working capital.

4.     <u>Intentionally Omitted</u>

5.     <u>Maturity Date</u>:

   (a)     LOC Commitment:     February 12, 2009.

6.     <u>Collateral</u>:

   (a)     Personal Property:     The personal property listed on <u>Exhibit A</u>.

7.     <u>Interest Rate</u>:

   (a)     LOC Commitment: A per annum rate of one half of one percentage point above the Prime Rate.

8.     <u>Facility Fee</u>:

   (a)     LOC Commitment: A fully earned, non-refundable Facility Fee of $4,250 payable on the Effective Date.

9.     <u>Effective Date</u>: The date Bank executes this Loan Agreement.

10.     <u>Payment Date</u>: On the 12th of each month as to the LOC Commitment.

11.     <u>Payments</u>:

1

(a)     LOC Commitment:   Payments of interest on the outstanding LOC Advances are payable on each Payment Date. The entire balance of the LOC Commitment is due and payable on the LOC Maturity Date. If a payment is more than 15 days late, Borrower will be charged a late fee of 7% of the scheduled payment.

12.     **Closing Fees & Expenses**: Facility Fee <u>plus</u> all out of pocket Bank Expenses incurred through Effective Date.   Bank Expenses due at the Effective Date include audit fees and expenses, legal and documentation fees, state filing fees, escrow fees, appraisal fees, environmental review fees, title insurance fees and premiums, collateral search and credit reporting fees.

13.     **Borrower's Reports**:

(a)     Quarterly Borrower-prepared, GAAP-based Financial Statements, along with accounts receivable and accounts payable agings, inventory report to include all Demetria and other labels/brands produced by Borrower, and Compliance Certificate within 30 days of the end of each quarter.

(b)     Beginning with 2007, Federal Income Tax returns of Borrower and Daz Holdings, LLC within 20 days of filing.

(c)     Federal Income Tax Returns and K-1 of Centrium Associates, LLC within 20 days of filing.

(d)     Federal Income Tax Returns and K-1 of Constantine A. Zahoudanis within 20 days of filing.

(e)     Constantine A. Zahoudanis's personal financial statements on or prior to January 30th of each year.

14.     **Collateral Inspection**:   Bank will have the right to inspect, at Borrower's expense, Collateral (whether pledged by Borrower, any guarantor or otherwise) as set forth in Section 5.2 of this Loan Agreement.

15.     **Financial Covenants**:

(a)     Borrower will maintain as of the last day of each quarter (as defined in Section 5.6 of this Loan Agreement):

(i)     **Minimum EBIDA.** Maintain a minimum EBIDA of $265,000 on June 30, 2008 and $665,000 on December 31, 2008, based on Borrower's June 30, 2008 and December 31, 2008 financial statements

(ii)     **Total Liabilities to Tangible Net Worth.** Maximum Total Liabilities to Tangible Net Worth of 3:00:1.00.

16.     **Intentionally Omitted**

17.     **Guarantors**: Constantine A. Zahoudanis and Centrium Associates, LLC.

18.     **Promise to Pay**:   Borrower will pay Bank the unpaid principal balance of all amounts advanced and all fees and charges with respect thereto, together with interest thereon from the date advanced or incurred until paid in full, as provided in this Loan Agreement.

19.    <u>Loan Agreement</u>:    The terms and conditions on which Bank will lend to Borrower and Borrower will repay Bank are set forth herein, which includes and incorporates by this reference the attached *Loan and Security Agreement Additional Terms and Conditions* and all attached exhibits and schedules (collectively, the "**Loan Agreement**").    If there is a conflict between the terms hereof and the *Loan and Security Agreement Additional Terms and Conditions*, the terms hereof will control.    Capitalized terms are defined in the places indicated in the attached *Index of Defined Terms*.

3

# LOAN AND SECURITY AGREEMENT
## ADDITIONAL TERMS AND CONDITIONS

**Bank:**      SILICON VALLEY BANK

**Borrower:**   DAZ VINEYARDS, LLC

**Loan Agreement dated:  as of the Effective Date**

1.   <u>ADVANCES</u>:  Advance(s) refers to LOC Advances or any or all, as the context requires.

     1.1   **Method of Obtaining Advances.**  To obtain an Advance, Borrower must notify Bank by facsimile or telephone by 3:00 p.m. Pacific time on the Business Day that the Advance is to be made.  For purposes hereof, a **"Business Day"** is any day other than a Saturday, Sunday or a day on which the Bank is closed.  Borrower must promptly confirm the notification by delivering to Bank the **"Payment/Advance Form"** attached as <u>Exhibit C</u>.  Bank will credit Advances to Borrower's deposit account.  Bank may make Advances based on instructions from an individual authorized in writing by Borrower to draw Advances or his or her designee (an **"Authorized Signer"**), or without instructions if the Advances are necessary to meet Obligations which have become due. Bank may rely on any telephone notice given by a person whom Bank believes is an Authorized Signer.  Borrower will indemnify Bank for any loss Bank suffers due to such belief or reliance.

     1.2   **LOC Advances.**   Bank will make LOC Commitment advances (**"LOC Advances"**) to Borrower in an aggregate amount not exceeding the LOC Commitment.  LOC Advances may be repaid and reborrowed through the LOC Maturity Date.

     1.3   **Intentionally Omitted.**

     1.4   **Intentionally Omitted.**

     1.5   **Intentionally Omitted.**

     1.6   **Intentionally Omitted.**

     1.7   **Overadvances in Excess of Commitment.**  If the amount of all Obligations owed by Borrower to Bank relating to the LOC Advances, now or in the future, including interest, principal and expenses, exceed the LOC Commitment, Borrower must immediately pay Bank the excess.

     1.8   **Interest Rate.**  All Obligations accrue interest until paid in full at the applicable Interest Rate.  The Interest Rate increases or decreases when Bank's Prime Rate increases or decreases.  After an Event of Default, all outstanding amounts accrue interest until paid at a per annum rate of 5.00 percentage points over the applicable Interest Rate (the **"Default Rate"**).   Interest is computed on a 360 day year for the actual number of days elapsed.

     **"Prime Rate"** refers to the Bank's most recently announced "Prime Rate," which is currently 6.00%, even if the announced rate is not Bank's lowest rate.

     1.9   **Maturity Date.**  All outstanding amounts with respect to the LOC Commitment are due and payable in full, and the LOC Commitment will expire, on the LOC Maturity Date.

     1.10   **Facility Fee.**  The Closing Fees and Expenses will be due and payable on the Effective Date.

4

1.11    **Bank Expenses.** Borrower will pay all audit and inspection fees and expenses and the reasonable costs and expenses (including reasonable attorney's fees, expert witness' and consultants' fees and related expenses) of preparing, negotiating, administering, defending and enforcing (including appeals or Insolvency Proceedings) the Loan Documents (as defined in Section 3 (*CREATION OF SECURITY INTEREST*)) (collectively, "**Bank Expenses**") which Bank Expenses will be payable by Borrower upon demand by Bank.

1.12    **Debit of Deposit Accounts.** Bank may debit any of Borrower's deposit accounts, including Bank account number _____ for payment of any Obligations. Bank will notify Borrower when it debits Borrower's deposit accounts. These debits are not a set-off. Payments received after 12:00 noon Pacific Time are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment is due the next Business Day and additional fees or interest accrue.

2.    <u>CONDITIONS OF LOANS</u>

2.1    **Conditions Precedent to all Advances.** Bank's obligation to make each Advance, including the initial Advance, is subject to the following:

(a)    Bank has received all agreements, documents and fees it requires (including this Loan Agreement, Deed of Trust, guaranties of the Guarantors and subordination agreements with other lenders, if any);

(b)    Bank's timely receipt of any Payment/Advance Form;

(c)    Bank has received a current Borrowing Base Certificate (as detailed in Section 1.3); and

(d)    The representations and warranties in Section 4 (*REPRESENTATIONS AND WARRANTIES*) must be materially true on the date of the Payment/Advance Form and on the funding date of each Advance and no Event of Default may have occurred and be continuing, or result from the Advance. By requesting an Advance Borrower is representing and warranting that the representations and warranties of Section 4 (*REPRESENTATIONS AND WARRANTIES*) remain true as of the date of the Advance.

2.2    **Intentionally Omitted.**

3.    <u>CREATION OF SECURITY INTEREST</u>

3.1    **Grant of Security Interest.** Borrower grants Bank, and confirms to Bank any previous grant of, a continuing security interest in all presently existing and later acquired Collateral to secure prompt payment and performance of the Obligations and of each of Borrower's duties under this Loan Agreement and any document or instrument entered into in connection herewith (as amended, restated or otherwise modified from time to time, collectively, the "**Loan Documents**").

3.2    Except for (i) liens existing on the Effective Date and listed on <u>Schedule 1</u>, (ii) subordinate liens for taxes, assessments or other government impositions that are either not delinquent or being contested in good faith and for which Borrower maintains adequate reserves on its books, (iii) other liens accepted in writing by the Bank from time to time (each a "**Permitted Lien**"), Bank's security interest in the Collateral will be a first priority security interest in the Collateral. If this Loan Agreement is terminated, Bank's security interest in the Collateral will continue until Borrower fully satisfies all of its Obligations.

Borrower authorizes Bank to file financing statements without notice to Borrower, with all appropriate jurisdictions, or take any other action as Bank deems appropriate, to perfect or protect Bank's interest in the Collateral.

3.3    **Protection of Collateral.** Borrower shall make any payments and do any act necessary or convenient to protect the Collateral and the value of Bank's interest therein. Borrower agrees to execute such documents, instruments, and agreements, and to provide detail concerning the Collateral, as Bank may require to perfect, maintain the priority of, and protect its security interest in the Collateral. Bank shall have all of the rights and remedies of a secured party under the California Commercial Code (the "**Code**") and may (but shall not be obligated to) make any payments and do any acts it considers necessary or reasonable, including without limitation the commencement, prosecution or defense of any proceeding Bank deems appropriate, to protect its security interest in the Collateral or the value of Bank's interest therein. If Borrower fails to pay any amount, perform any obligation, or furnish any required proof of payment to third persons as required hereunder, Bank may (but shall not be obligated to) make all or part of the payment, perform such obligation (in whole or in part) or obtain insurance policies required in Section 5.5 (*Insurance*), and take any action under the policies Bank deems prudent. Any amounts paid by Bank hereunder are Bank Expenses and immediately due and payable, bearing interest at the then applicable default rate and secured by the Collateral. No payments by Bank are an agreement to make similar payments in the future or Bank's waiver of any Event of Default.

3.4    **Liability for Collateral.** Borrower bears all risk of loss, damage, destruction or diminution in value of the Collateral and Real Property, if any, or any act of any carrier, warehouseman, bailee or other person. Without limiting the foregoing, Bank shall have no liability to Borrower or any other Person for making any payment or taking any action under Section 3.3 hereof or failing to do the same.

4.    <u>REPRESENTATIONS AND WARRANTIES</u>

Borrower makes the following representations and warranties, which are in addition to (and do not limit) any prior representations and warranties made for the benefit of Bank. All representations and warranties made for the benefit of Bank are true and correct as of the Effective Date and date of each Advance and will survive the Effective Date and the making of each Advance:

4.1    **Due Organization and Authorization.** Borrower and each subsidiary is duly existing and in good standing in its state of formation California and qualified and licensed to do business in, and in good standing in, any jurisdiction in which the conduct of its business or its ownership of property requires that it be qualified. Borrower's legal name is as set forth on the first page of this Loan Agreement and Borrower has disclosed to Bank all trade names under which it conducts its business. The execution, delivery and performance of the Loan Documents have been duly authorized, and do not conflict with Borrower's formation documents, nor constitute an event of default under any material agreement by which Borrower is bound. Borrower is not in default under any agreement to which or by which it is bound in which the default could cause a "Material Adverse Change" as defined in Section 7.12 (*Material Adverse Change*).

4.2    **Collateral and Real Property.** Borrower has good title to the Collateral, free of Liens except Permitted Liens. Borrower has no other deposit account, other than the deposit accounts with Bank or as described in <u>Schedule I</u>. The Accounts are bona fide, existing obligations, and the service or property has been performed or delivered to the account debtor or its agent for immediate shipment to and unconditional acceptance by the account debtor. Except as otherwise disclosed on <u>Schedule 1</u>, the Collateral is not in the possession of any third party bailee (such as at a warehouse). In the event that Borrower, after the date hereof, intends to store or otherwise deliver the Collateral to such a bailee, then Borrower will receive the prior written consent of Bank and such bailee must acknowledge in writing that the bailee is holding such Collateral for the benefit of Bank. All Inventory is in all material respects of good and marketable quality, free from material defects. Except as otherwise disclosed to Bank, Borrower has not registered any copyright owned by it with the United States Copyright Office or any foreign copyright office.

4.3    **Litigation.** There are no actions or proceedings pending or, to Borrower's

knowledge, threatened by or against Borrower or any subsidiary in which an adverse decision could cause a Material Adverse Change.

**4.4    No Material Adverse Change In Financial Statements.**  All consolidated financial statements for Borrower, Guarantor and any subsidiary, delivered to Bank fairly present in all material respects the consolidated financial condition and consolidated results of operations of each Borrower and Guarantor.  There has not been any material deterioration in the consolidated financial condition of each Borrower and Guarantor since the date of the most recent financial statements submitted to Bank.

**4.5    Solvency.**  The fair salable value of Borrower's assets (including goodwill minus disposition costs) exceeds the fair value of its liabilities.  Borrower is not left with unreasonably small capital after the transactions in this Loan Agreement; and Borrower is able to pay its debts (including trade debts) as they become due.

**4.6    Regulatory Compliance.**  Borrower is not an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations G, T and U of the Federal Reserve Board of Governors).  Borrower is in compliance with the Federal Fair Labor Standards Act.  Borrower has not violated and is not violating any laws, ordinances or rules, the violation of which could cause a Material Adverse Change.  None of Borrower's or any subsidiary's properties or assets has been used by Borrower or any subsidiary or, to the best of Borrower's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than minimal amounts legally in the ordinary course of Borrower's business.  Borrower has delivered to Bank, and at all times will deliver to Bank promptly after delivery or receipt, copies of all reports, investigations and correspondence relating to hazardous substances.  Borrower and each subsidiary have timely filed all required tax returns and paid, or made adequate provision to pay, all taxes, except those being contested in good faith with adequate reserves under GAAP.  Borrower and each subsidiary have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all government authorities that are necessary in connection with the performance of its obligations under the Loan Documents or to continue its business as currently conducted.

**4.7    Subsidiaries, Ownership and Investments.**  The equity owners of Borrower are listed on Schedule 1.  Borrower does not own any subsidiary or any stock, partnership interest, limited liability company membership interest or other equity securities and does not have any Investments except for (i) Investments existing on the Effective Date and disclosed to and accepted by Bank in writing and listed on Schedule 1; and (ii) Bank's certificates of deposit issued maturing no more than one year after issue; and (iii) any other investment approved by Bank in writing (each, a "**Permitted Investment**"). As used herein, the term "**Investment**" means any beneficial ownership (including stock, partnership interest, limited liability company membership interest or other equity investment) of any entity or any loan, advance or capital contribution to any Person.

**4.8    Full Disclosure.**  No representation, warranty or other statement of Borrower or Guarantors in any certificate or written statement given to Bank contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading as of the date made.

**4.9    Intellectual Property Rights.**  Borrower has the right to use all intellectual property owned or used by Borrower in connection with its business without infringing or violating the rights of any third parties.  The use of such intellectual property does not require the consent of any third party that has not been obtained.  There exist no claims challenging the right of Borrower to use any such intellectual property.  Borrower has taken all steps necessary to maintain the existence, validity and enforceability of all such intellectual property.

5.    **AFFIRMATIVE COVENANTS**

Borrower will do all of the following:

5.1    **Government Compliance.**  Borrower will maintain its and all subsidiaries' legal existence and good standing in its jurisdiction of formation and maintain qualification to do business in each jurisdiction in which the failure to so qualify could have a material adverse effect on Borrower's business or operations.  Borrower will comply, and cause each subsidiary to comply, with all laws, ordinances and regulations to which it is subject noncompliance with which could have a material adverse effect on the Collateral, the Real Property or Borrower's business or operations or cause a Material Adverse Change.

5.2    **Financial Statements, Reports, Certificates.**  Borrower will deliver to Bank:

(a)    (i) as soon as available, but no later than 30 days after the last day of each quarter, a company prepared consolidated balance sheet and income statement covering Borrower's consolidated operations during the period, in a form and certified as accurate and complete by an Authorized Signer, and acceptable to Bank and (ii) budgets, sales projections, operating plans or other financial information Bank reasonably requests.

(b)    Within 20 days after filing (but no later than April 30 of the year following the tax year in question, or, if applicable, no later than 20 days after the expiration of any applicable extension), copy of Borrower's Federal Income Tax return.

(c)    Within 30 days after the last day of each quarter, Borrower will deliver to Bank its aged listings of accounts receivable and accounts payable (by invoice date), and inventory report to include all Demetria and other labels/brands produced by Borrower.

(d)    Within 30 days after the last day of each quarter, Borrower will deliver to Bank with the monthly financial statements a "**Compliance Certificate**" signed by an Authorized Signer in the form of Exhibit E.

(e)    Within 20 days after filing (but no later than April 30 of the year following the tax year in question, or, if applicable, no later than 20 days after the expiration of any applicable extension), copies of Guarantor(s) Federal Income Tax returns and, at the same time as the Federal Income Tax returns, personal financial statements of the Guarantors, prepared under GAAP for the period covered by the Federal Income Tax returns.

(f)    Bank has the right to inspect Borrower's Accounts, Inventory and other Collateral at Borrower's expense, prior to the initial Advance after an of Event of Default has occurred and is continuing (in which case Bank may inspect the Collateral as often as it deems necessary in its sole discretion).  In addition, upon not less than 30 days' notice from Bank to Borrower, Bank may change the frequency period during which inspections may be conducted.

5.3    **Inventory; Returns.**  Borrower will keep all Inventory in good and marketable condition, free from material defects.  Returns and allowances between Borrower and its account debtors will follow Borrower's customary practices as they exist on the Effective Date.  Borrower must promptly notify Bank of all returns, recoveries, disputes, and claims that involve more than $50,000 in the aggregate.

5.4    **Taxes.**  Borrower will make, and cause each subsidiary to make, timely payment of all material federal, state, and local taxes or assessments and will deliver to Bank, on demand, appropriate certificates attesting to the payments.

5.5    **Insurance.**  Borrower will at all times keep its business and the Collateral insured for risks and in amounts standard for companies in Borrower's industry and location and as Bank may request.  Insurance policies will be in a form, with companies, and in amounts that are satisfactory to

Bank. All property policies will have a Bank's lender's loss payable endorsement showing Bank as an additional loss payee and all liability policies will show Bank as an additional insured and provide that the insurer must give Bank at least 20 days notice before canceling its policy. At Bank's request, Borrower will deliver certified copies of policies and evidence of all premium payments. Proceeds payable under any policy will, at Bank's option, be payable to Bank on account of the Obligations. If Borrower fails to obtain insurance as required under this Section 5.5 or to pay any amount or furnish any required proof of payment to third persons and Bank, Bank may make all or part of such payment or obtain such insurance policies required in this Section 5.5, and take any action under the policies Bank deems prudent.

     5.6    **Financial Covenants.** Borrower will be in compliance with the Financial Covenants set forth in Paragraph 15 (*Financial Covenants*) on page 2 of this Loan Agreement as of the last day of each month, quarter or year, as the case may be. In determining Borrower's compliance with these Financial Covenants:

     "**Accounts**" are any "accounts" as defined in the Code, including but not limited to all existing and later arising accounts, contract rights, and other obligations owed to Borrower in connection with its sale or lease of goods or provision of services, all credit insurance, guaranties, other security and all merchandise returned to or reclaimed by Borrower and Borrower's books relating to any of the foregoing.

     "**Contingent Obligation**" means, for any Person, any direct or indirect liability, contingent or not, of that person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as an obligation directly or indirectly guaranteed, endorsed, co-made, discounted or sold with recourse by that person, or for which that person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the account of that person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the person in good faith; but the amount may not exceed the maximum of the obligations under the guarantee or other support arrangement.

     "**EBIDA**" means, for any fiscal period, net after tax earnings before Interest Expense, depreciation and amortization, determined in accordance with GAAP for the applicable fiscal year period.

     "**Indebtedness**" means, on any date, (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations and (d) Contingent Obligations.

     "**Insolvency Proceeding**" means proceedings by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors or the appointment of any custodian or receiver, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

     "**Interest Expense**" means, for any fiscal period, interest expense on all Indebtedness, accruing in accordance with GAAP for the applicable fiscal year period.

     "**Long Term Debt**" means, on any date, all Indebtedness that is not payable on demand or within one year from the date of determination thereof (unless such Indebtedness is renewable or extendable at the option of Borrower to a date more than one year from the date of determination), but excluding: (a) LOC Advances hereunder; and (b) Subordinated Debt.

     "**Obligations**" are debts, principal, interest, Bank Expenses and any other amounts of

any kind Borrower owes to Bank now or later, whether under this Loan Agreement or otherwise, and including without limitation cash management services, letters of credit and foreign exchange contracts, if any and including interest accruing after Insolvency Proceedings begin, and debts, liabilities, or obligations of Borrower assigned to Bank.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company association, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Subordinated Debt**" means, on any date, debt incurred by Borrower subordinated to Borrower's indebtedness owed to Bank and which is reflected in a written agreement satisfactory to Bank. Borrower shall not make any payment on the Subordinated Debt, except as permitted under the terms of a Subordination Agreement (in a form and substance acceptable to Bank) executed between the Borrower's subordinated creditor and Bank; and Borrower shall not amend any provision in any document relating to the Subordinated Debt without Bank's prior written consent. All Subordinated Debt shall be listed on Schedule 1 hereto and a copy of all documents constituting any Subordinated Debt shall be attached to Schedule 1.

"**Tangible Net Worth**" means, on any date, the consolidated total assets of Borrower and its subsidiaries minus, (a) any amounts attributable to (i) goodwill, (ii) intangible items such as unamortized debt discount and expense, patents, trade and service marks and names, copyrights and research and development expenses except prepaid expenses, and (iii) reserves not already deducted from assets, and (b) Total Liabilities.

"**Total Liabilities**" means, on any date, obligations that should, under GAAP, be classified as liabilities on Borrower's consolidated balance sheet, including all Indebtedness.

5.7    **Primary Accounts.**  Borrower will maintain its primary depository and operating accounts with Bank.

5.8    **Deposit Requirement.**  Borrower will deposit $500,000 in a controlled account with Bank within 60 days following the Effective Date.

5.9    **Further Assurances.**  Borrower will execute any further instruments and take further action as Bank requests to perfect or continue Bank's security interest in the Collateral or to affect the purposes of this Loan Agreement.

6.    <u>NEGATIVE COVENANTS</u>

Borrower will not do any of the following:

6.1    **Dispositions.**  Convey, sell, lease, transfer or otherwise dispose of (collectively "**Transfer**"), or permit any of its subsidiaries to Transfer, all or any part of its business or property, other than Transfers (a) of Inventory in the ordinary course of business, (b) of non-exclusive licenses and similar arrangements for the use of the property of Borrower or its subsidiaries in the ordinary course of business, or (c) of worn-out or obsolete equipment.

6.2    **Changes in Business, Ownership, Management or Business Locations.** Engage in or permit any of its subsidiaries to engage in any business other than the businesses currently engaged in by Borrower or have a material change in its ownership of greater than 25%, or management or in Borrower's key operations personnel. Borrower will not, without at least 30 days prior written notice to Bank, change its name or jurisdiction of organization, relocate its chief executive office or add any new offices or business locations.

6.3    **Mergers or Acquisitions.**  (a) Merge or consolidate, or permit any of its

subsidiaries to merge or consolidate, with any other Person, or acquire, or permit any of its subsidiaries to acquire, all or substantially all of the capital stock or property of another Person or (b) merge or consolidate a subsidiary into another subsidiary or into Borrower.

      6.4     **Indebtedness.**  Create, incur, assume, or be liable for any Indebtedness, or permit any subsidiary to do so, other than Permitted Indebtedness.  "**Permitted Indebtedness**" is (a) Borrower's indebtedness to Bank under this Loan Agreement or any other Loan Document: (b) Indebtedness existing on the Effective Date and disclosed to and consented to by Bank in writing and listed on Schedule 1; (c) Subordinated Debt; (d) Indebtedness to trade creditors incurred in the ordinary course of business; and (e) Indebtedness secured by Permitted Liens.

      6.5     **Encumbrance.**  Create, incur, or allow (a) any lien on any of the Collateral, or assign or convey any right to receive income, including the sale of any Accounts, or permit any of its subsidiaries to do so, except for Permitted Liens, or permit any Collateral not to be subject to the first priority security interest granted herein, or (b) the Real Property not to be subject to the first priority lien of the Deed of Trust except for Permitted Exceptions.

      6.6     **Investments/Distributions.**  Directly or indirectly acquire or own any Person, or make any Investment in any Person, other than Permitted Investments, or permit any of its subsidiaries to do so.  Declare, make or pay any dividends or make any distribution (except for Permitted Distributions) or payment or redeem, retire or purchase any capital stock or other equity interest.

      6.7     **Transactions with Affiliates.**  Directly or indirectly enter or permit any material transaction with any affiliate except transactions that are in the ordinary course of Borrower's business, on terms less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

      6.8     **Subordinated Debt.**  Make or permit any payment on any Subordinated Debt, except under the terms of the Subordinated Debt, or amend any provision in any document relating to the Subordinated Debt without Bank's prior written consent.

      6.9     **Representations and Warranties.**  Cause or suffer any of Borrower's representations and/or warranties made in this Loan Agreement, any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Loan Agreement or any Loan Document to become untrue.

      6.10    **Critical Relationships.**  Make or suffer any change in Borrower's grower, supplier, or distribution relationships that would cause a Material Adverse Change.

    7.     **EVENTS OF DEFAULT**

      Any one of the following is an "**Event of Default**" by Borrower:

      7.1     **Payment Default.**  If Borrower fails to pay or perform any of the Obligations promptly when due.

      7.2     **Impairment of Collateral.**  If there occurs any impairment of the perfection or priority, or in the value, of Bank's security interest in the Collateral or lien on the Real Property or of the value of such Collateral or Real Property which is not covered by adequate insurance.

      7.3     **Covenant Default.**

          (a)     If Borrower fails to perform any obligation under Sections 5.2 or 5.6 or 5.8 violates any of the covenants contained in Article 6 of this Loan Agreement, or

          (b)     If Borrower fails or neglects to perform, keep, or observe any other term,

provision, condition, covenant or agreement contained in this Loan Agreement (other than those referred to in Sections 7.1 and 7.2), in any of the Loan Documents, or in any other present or future agreement between Borrower and Bank and, as to any such other term, provision, condition, covenant or agreement that can be used cured, has failed to cure the same within 10 days after the occurrence thereof.

7.4    **Insolvency.** If any portion of Borrower's or Guarantor assets are attached, seized or levied upon, or if Borrower or Guarantor becomes insolvent or if Borrower or Guarantor begins an Insolvency Proceeding or an Insolvency Proceeding is begun against Borrower or Guarantor.

7.5    **Intentionally Omitted.**

7.6    **Intentionally Omitted.**

7.7    **Other Agreements.** If there is a default in any agreement between Borrower and a third party, or Guarantor and a third party, giving the third party the right to accelerate any Indebtedness exceeding $100,000 or that could cause a Material Adverse Change.

7.8    **Judgments.** If a money judgment(s) in the aggregate during the term of this Loan Agreement of at least $50,000 is rendered against Borrower or Guarantor (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) and is unsatisfied and unstayed for 10 days (but no Advances will be made before the judgment is stayed or satisfied).

7.9    **Invalidity.** Any material provision of any of the Loan Documents shall for any reason cease to be valid and binding on Borrower, any Guarantor or any subordinating creditor, or Borrower, any Guarantor or any subordinating creditor shall assert such cessation, any Guarantor shall attempt to terminate his, her or its Guaranty or subordinating creditor shall attempt to terminate his, her or its subordination agreement.

7.10    **Misrepresentations.** If Borrower, any Guarantor or any Person acting for Borrower makes any material misrepresentation or material misstatement now or in the future in any warranty or representation in any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Loan Agreement or any Loan Document.

7.11    **Guaranty.** Guarantor does not perform any obligation under any guaranty of the Obligations or any material misrepresentation or material misstatement exists now or later in any warranty or representation in any guaranty of the Obligations or in any certificate deliver to Bank in connection with the guaranty.

7.12    **Material Adverse Change.** If there (i) occurs a material adverse change in the business, operations, or financial condition of the Borrower or of the Guarantors or (ii) is a material impairment of the prospect of repayment of any portion of the Obligations (the foregoing being defined as a "**Material Adverse Change**").

8.    **BANK'S RIGHTS AND REMEDIES**

8.1    **Rights and Remedies.**

If an Event of Default occurs and continues Bank may, without notice or demand, do any or all of the following:

(a)    Declare all Obligations immediately due and payable (but if an Event of Default described in Section 7.4 (*Insolvency*) occurs, all Obligations are immediately due and payable without any action by Bank);

(b)    Stop advancing money or extending credit for Borrower's benefit under

this Loan Agreement or under any other agreement between Borrower and Bank (but if an Event of Default under Section 7.4 occurs Bank's obligation to advance money or extend credit shall automatically terminate);

(c)      Settle or adjust disputes and claims directly with Borrower's account debtors for amounts, on terms and in any order that Bank considers advisable;

(d)      Make any payments and do any acts it considers necessary or reasonable to protect its security interest in the Collateral or the Real Property. Borrower will assemble the Collateral if Bank requires and deliver or otherwise make it available as Bank designates. Bank may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any lien which appears to be prior or superior to its security interest and pay all expenses incurred. Borrower grants Bank a license to enter and occupy any of its premises, without charge, to exercise any of Bank's rights or remedies;

(e)      Apply to the Obligations any (i) balances and deposits of Borrower it holds, or (ii) any amount held by Bank owing to or for the credit or the account of Borrower;

(f)      Place a "hold" on any account maintained with Bank and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any control agreement or similar agreements providing control of any Collateral;

(g)      Petition any court of competent jurisdiction for the appointment of a receiver or for an order for possession of the Collateral, without notice and without regard to the value or condition of the Collateral or the Real Property, and Borrower waives any rights it has under applicable law to oppose or otherwise contest the appointment of a receiver or application for an order for the possession of the Collateral;

(h)      Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral. Borrower hereby grants to Bank a non-exclusive, royalty-free license or other right to use, without charge, Borrower's labels, customer and mailing lists, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any similar rights or property as it pertains to the Collateral, in completing production of, bottling, labeling, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of its rights under this section (Borrower's rights under all licenses and all franchise agreements inure to Bank's benefit);

(i)      Exercise any of the Bank's rights and remedies under the Code, including without limitation disposition of the Collateral according to the Code or the Deed of Trust, as applicable, separately or in one disposition, which may be in a public or private sale and at such prices (on cash or for credit) as Bank determines are commercially reasonable, and in such order and with such disclaimers of warranties as Bank determines, and any notice of sale, disposition or other intended action by Bank with respect to the Collateral sent to Borrower at least five (5) days prior to such sale. disposition or action shall constitute reasonable notice to Borrower;

(j)      Demand and receive possession of Borrower's books and records; and

(k)      Exercise any of the Bank's rights and remedies under the Loan Documents (including the Deed of Trust) or at law or equity.

8.2      **Power of Attorney.** Borrower hereby irrevocably appoints Bank as its lawful attorney, effective only when an Event of Default occurs and continues, to: (a) endorse Borrower's name on any checks or other forms of payment or security; (b) sign Borrower's name on any invoice or bill of lading for any Account or drafts against account debtors, (c) make, settle, and adjust all claims under Borrower's insurance policies; (d) settle and adjust disputes and claims about the Accounts directly with account debtors, for amounts and on terms Bank determines reasonable; and (e) transfer the Collateral

into the name of Bank or a third party as the Code permits. Bank may exercise the power of attorney to sign Borrower's name on any documents necessary to perfect or continue the perfection of any security interest regardless of whether an Event of Default has occurred. Bank's appointment as Borrower's attorney-in-fact, and all of Bank's rights and powers, are coupled with an interest, and are irrevocable until all Obligations have been fully repaid and performed and Bank's obligation to provide Advances terminates.

       8.3    **Accounts Collection.**  If an Event of Default occurs and continues, Bank may notify any person owing Borrower money of Bank's security interest in the funds and verify the amount of the Account. Borrower must collect all payments in trust for Bank and, if requested by Bank, immediately deliver the payments to Bank in the form received from the account debtor, with all necessary endorsements for deposit.

       8.4    **Remedies Cumulative.**  Bank's rights and remedies under this Loan Agreement, the Loan Documents, and all other agreements are cumulative. In addition, Bank has all rights and remedies provided under the Code, by law, or in equity. Bank's exercise of one right or remedy is not an election, and Bank's waiver of any Event of Default is not a continuing waiver. Bank's delay is not a waiver, election, or acquiescence. No waiver is effective unless signed by Bank and then is only effective for the specific instance and purpose for which it was given.

       8.5    **Certain Waivers.**  Borrower waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Bank on which Borrower is liable.

       8.6    **Application of Proceeds; Deficiency.**  After the occurrence and during the continuation of an Event of Default, Bank may apply any funds in its possession, whether from payments, the proceeds of the sale of the Collateral or the Real Property, balances in accounts maintained with Bank or otherwise, to the Obligations, in such order as Bank in its discretion determines. Borrower shall be liable for any deficiency after the application of all such amounts to the Obligations.

    9.    <u>NOTICES</u>

       All notices or demands by any party concerning the Loan Documents must be in writing and be personally delivered or sent by an overnight delivery service, by certified mail, postage prepaid, return receipt requested, or by facsimile to the addresses set forth at the beginning of this Loan Agreement. Any party may change its notice address by giving the other party written notice.

    10.    <u>CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER</u>

       California law governs the Loan Documents without regard to principles of conflicts of law. Borrower and Bank each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California.

       TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND BANK EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED, OR HAS HAD THE OPPORTUNITY TO REVIEW, THIS WAIVER WITH ITS COUNSEL.

       WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between

them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to the California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against Collateral, or obtain provisional remedies from a court of competent jurisdiction. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

11.    **GENERAL PROVISIONS**

       **11.1    Indemnification.** Borrower will indemnify, defend and hold harmless Bank and its affiliates, officers, employees, and agents (each, an "**Indemnified Person**") against: (a) all Obligations, demands, claims, and liabilities asserted by any Person in connection with the transactions contemplated by the Loan Documents; and (b) all losses or Bank Expenses incurred, or paid by such Indemnified Person from, following, or relating to transactions between Bank and Borrower except for losses caused by such Indemnified Person's gross negligence or willful misconduct.

       **11.2    Confidentiality.** In handling any confidential information, Bank shall exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made: (a) to Bank's Subsidiaries or Affiliates; (b) to prospective transferees or purchasers of any interest in the Credit Extensions (provided, however, Bank shall use commercially reasonable efforts to obtain such prospective transferee's or purchaser's agreement to the terms of this provision); (c) as required by law, regulation, subpoena, or other order; (d) to Bank's regulators or as otherwise required in connection with Bank's examination or audit; (e) as Bank considers appropriate in exercising remedies under the Loan Documents; and (f) to third-party service providers of Bank so long as such service providers have executed a confidentiality agreement with Bank with terms no less restrictive than those contained herein. Confidential information does not include information that either (x) is in the public domain or in Bank's possession when disclosed to Bank, or becomes part of the public domain after disclosure to Bank; or (y) is disclosed to Bank by a third party, if Bank does not know that the third party is prohibited from disclosing the information.

       Bank may use confidential information for any purpose, including, without limitation, for the development of client databases, reporting purposes, and market analysis, so long as Bank does not disclose Borrower's identity or the identity of any person associated with Borrower unless otherwise expressly permitted by this Agreement. The provisions of the immediately preceding sentence shall survive the termination of this Agreement.

       **11.3    General Provisions.** This Loan Agreement binds and is for the benefit of the

successors and permitted assigns of each party. Borrower may not assign this Loan Agreement or any rights hereunder without Bank's prior written consent which may be granted or withheld in Bank's sole discretion. Bank has the right, without the consent of or notice to Borrower, to sell, transfer, negotiate, or grant participation in all or any part off, or interest in, Bank's obligations, rights, and benefits under this Loan Agreement. Time is of the essence for the performance of all Obligations in this Loan Agreement. This Loan Agreement contains the entire understanding of the parties on this subject. All amendments to this Loan Agreement must be in writing signed by the Borrower and Bank. Each provision of this Loan Agreement is severable from every other provision in determining enforceability of any provision. For convenience, this Loan Agreement may be executed in any number of counterparts with the same effect as if each party had executed the same document. All covenants, representations and warranties made in this Loan Agreement will continue in full force while any Obligations remain outstanding. The obligations of Borrower in Section 11.1 to indemnify Bank will survive until all statutes of limitations for actions that may be brought against Bank have run.

[Signature page follows.]

Please indicate your acceptance of these terms by signing this Loan Agreement in the space indicated below.

Borrower

Daz Vineyards, LLC

By:

Name: John Zahoudanis

Title: Manager

Bank

Silicon Valley Bank

By:

Name:                    Nancy Palumbo
Title:                   Relationship Manager

Effective Date: 2/15/08

## INDEX OF DEFINED TERMS

| | Page |
|---|---|
| Accounts | 9 |
| Bank | 1 |
| Bank Expenses | 5 |
| Borrower | 1 |
| Business Day | 4 |
| **Closing Date** | 2 |
| Closing Fees & Expenses | 2 |
| Code | 6 |
| **Collateral** | 1 |
| Commitment | 1 |
| Compliance Certificate | 8 |
| Contingent Obligation | 9 |
| **Default Rate** | 4 |
| **EBIDA** | 9 |
| Event of Default | 11 |
| Facility Fee | 1 |
| Indebtedness | 9 |
| Indemnified Person | 15 |
| Insolvency Proceeding | 9 |
| Interest Expense | 9 |
| Interest Rate | 1 |
| Loan Agreement | 3 |
| **Loan Documents** | 5 |
| LOC | 1 |
| LOC Advances | 4 |
| LOC Commitment | 1 |
| Long Term Debt | 9 |
| Material Adverse Change | 12 |
| Maturity Date | 1 |
| Obligations | 9 |
| Payment Date | 2 |
| Payment/Advance Form | 4 |
| Permitted Indebtedness | 11 |
| Permitted Investment | 7 |
| Permitted Lien | 5 |
| Person | 10 |
| Personal Property | 1 |
| **Prime Rate** | 4 |
| Purpose | 1 |
| Responsible Officer | 4 |
| Subordinated Debt | 10 |
| Tangible Net Worth | 10 |
| Total Liabilities | 10 |
| Transfer | 10 |

EXHIBIT A
Description of the Personal Property

The Collateral consists of all of Borrower's right, title and interest in and to the following:

All goods and equipment now owned or hereafter acquired, including, without limitation, all machinery, fixtures, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing, and all attachments, accessories, accessions, replacements, substitutions, additions, and improvements to any of the foregoing, wherever located;

All inventory, now owned or hereafter acquired, including, without limitation, all merchandise, grapes and grape juice, raw materials, bulk wine, cased goods, parts, supplies, packing and shipping materials, work in process and finished products including such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above;

All farm products, now owned or hereafter acquired, including without limitation crops and crop products, grapes, whether stored, planted, growing or to be grown or to be acquired by a third party, including crops thereafter grown, owned or acquired and all supplies related thereto, including, without limitation, fungicides, pesticides, fertilizers, and seeds;

All contract rights and general intangibles, now owned or hereafter acquired, including, without limitation, goodwill, trademarks, servicemarks, copyrights, trade styles, trade names, patents, patent applications, leases, license agreements, franchise agreements, blueprints, drawings, purchase orders, customer and mailing lists, route lists, infringements, claims, commercial tort claims, computer programs, computer discs, computer tapes, literature, reports, catalogs, design rights, income tax refunds, payments of insurance and rights to payment of any kind;

All copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished, now owned or hereafter acquired; all trade secret rights, including all rights to unpatented inventions, know-how, operating manuals, license rights and agreements and confidential information, now owned or hereafter acquired;

All now existing and hereafter arising accounts, health care receivables, contract rights, royalties, license rights and all other forms of obligations owing to Borrower arising out of the sale or lease of goods, the licensing of technology or the rendering of services by Borrower whether or not earned by performance, and any and all credit insurance, insurance (including refunds) claims and proceeds, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Borrower;

All documents, cash, deposit accounts, securities, securities entitlements, securities accounts, commodity accounts, investment property, financial assets, letters of credit, letter of credit rights, certificates of deposit, instruments and chattel paper and electronic chattel paper now owned or hereafter acquired;

All supporting obligations;

All of Borrower's books and records relating to any or all of the foregoing;

Any and all claims, rights and interests in any of the above and all substitutions for, and additions and accessions thereto; and

All proceeds of any and all of the foregoing.

All terms used in this Exhibit A that are defined in the Code shall have the meanings given to them in the Code, as amended from time to time.

EXHIBIT C

## LOAN PAYMENT/ADVANCE REQUEST FORM
### DEADLINE FOR SAME DAY PROCESSING IS 12:00, P.S.T.

Fax To:  (707) 968-9966                                    Date: _____

---

**LOAN PAYMENT:**

Daz Vineyards, LLC

From Account #_____     To Account #_____
                  (Deposit Account #)                                              (Loan Account #)

Principal $_____     and/or Interest $_____

Authorized Signature:_____     Phone Number: _____
Print Name/Title: _____

---

**LOAN ADVANCE:**

Complete *Outgoing Wire Request* section below if all or a portion of the funds from this loan advance are for an outgoing wire.

From Account #_____     To Account #_____
                  (Loan Account #)                                              (Deposit Account #)

Amount of Advance $_____

All Borrower's representations and warranties in the Loan and Security Agreement are true, correct and complete in all material respects on the date of the request for an advance; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date:

Authorized Signature:_____     Phone Number: _____
Print Name/Title: _____

---

**OUTGOING WIRE REQUEST:**
Complete only if all or a portion of funds from the loan advance above is to be wired.
Deadline for same day processing is noon, P.S.T.

Beneficiary Name: _____     Amount of Wire: $_____
Beneficiary Bank: _____     Account Number: _____
City and State: _____

Beneficiary Bank Transit (ABA) #: _____     Beneficiary Bank Code (Swift, Sort, Chip, etc.): _____
                                                                    (For International Wire Only)

Intermediary Bank: _____     Transit (ABA) #: _____
For Further Credit to: _____

Special Instruction: _____

*By signing below, I (we) acknowledge and agree that my (our) funds transfer request shall be processed in accordance with and subject to the terms and conditions set forth in the agreements(s) covering funds transfer service(s), which agreements(s) were previously received and executed by me (us).*

Authorized Signature: _____     2nd Signature (if required): _____
Print Name/Title: _____     Print Name/Title: _____
Telephone #: _____     Telephone #: _____

EXHIBIT E
COMPLIANCE CERTIFICATE

TO:    SILICON VALLEY BANK
       3700 Old Redwood Highway, Suite 220
       Santa Rosa, CA 95403
       Facsimile (707) 579-1004

FROM: Daz Vineyards, LLC

The undersigned authorized signatory of Daz Vineyards, LLC (the "Authorized Signer") certifies that under the terms and conditions of the Loan and Security Agreement between Borrower and Bank (the "Agreement"), (i) Borrower is in complete compliance for the period ending _____ with all required covenants except as noted below (ii) there are no Events of Default, (iii) all representations and warranties in the Agreement are true and correct in all material respects on this date, provided however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof: and provided further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, (iv) Borrower[, and each of its Subsidiaries], has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except as otherwise permitted pursuant to the terms of the Agreement, and (v) no Liens have been levied or claims made against Borrower [or any of its Subsidiaries] relating to unpaid employee payroll or benefits of which Borrower has not previously provided written notification to Bank. Attached are the required documents supporting the certification. The Authorized Signer certifies that these are prepared in accordance with Generally Accepted Accounting Principles (GAAP) consistently applied from one period to the next except as explained in an accompanying letter or footnotes. The Authorized Signer acknowledges that no borrowings may be requested at any time or date of determination that Borrower is not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this certificate is delivered. Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Agreement.

Please indicate compliance status by circling Yes/No under "Complies" column.

| Reporting Covenants | Required | Complies | |
|---|---|---|---|
| Quarterly financial statements | Quarterly within 30 days | Y | N |
| Federal Tax Returns and Schedule | Within 20 days of filing | Y | N |
| A/R & A/P Agings and Inventory Report | Quarterly within 30 days | Y | N |
| Compliance Certificate | Quarterly within 30 days | Y | N |
| Federal Tax Returns for Daz Holdings, LLC | Within 20 days of filing | Y | N |
| Constantine A. Zahoudanis Financial Statement | January 30th | Y | N |
| Guarantor Tax Return and schedule K-1 | within 20 days of filing | Y | N |
| | | Y | N |

| Financial Covenants | Required | Actual | Complies | |
|---|---|---|---|---|
| Maintain on a Quarterly Basis: | | | | |
| Minimum EBIDA | June 30, 2008: $265,000 Dec. 31, 2008: $665,000 | _____ | Y | N |
| Debt to Tangible Net Worth: | 3.00:1.00 or more | _____ | Y | N |

**Comments Regarding Exceptions:** See Attached.

[The following financial covenant analys[is][es] and
information set forth in Schedule 1 attached hereto
are true and accurate as of the date of this Certificate.

The following are the exceptions with respect to
the certification above.  (if no exceptions exist, state
"No exceptions to note.")]

Sincerely,


Daz Vineyards, LLC

_____
SIGNATURE

_____
TITLE

_____
DATE

| BANK USE ONLY | | |
|---|---|---|
| Received by: _____ | | |
| AUTHORIZED SIGNER | | |
| Date: _____ | | |
| Verified: _____ | | |
| AUTHORIZED SIGNER | | |
| Date: _____ | | |
| Compliance Status: | Yes | No |
| _____ | Yes | No |

<u>Schedule 1</u>

3.1(i)  Liens existing on the **Effective Date** and disclosed to and accepted by Bank in writing:

*n A*

4.2  Other deposit accounts:

*n A*

4.2  All third parties holding any Collateral:

*n A*

4.7  Owners of all equity interests of Borrower:

*n A*

4.7  Investments existing on the **Effective Date** and disclosed to and accepted by Bank in writing:

*n A*

**Subordinated Debt:**

$_____ in outstanding principal balance of shareholder notes and loans payable to

6.4(ii)  Indebtedness on the **Effective Date** and disclosed to and consented to by Bank in writing:

*N A*

3:08 PM
08/03/09
Cash Basis

Ops Proforma 2009 2010

# DAZ Vineyards, LLC
## Operating Proforma
### January 1 through December 31, 2010

| Ordinary Income/Expense | Jan 10 | Feb 10 | Mar 10 | Apr 10 | May 10 | Jun 10 | Jul 10 | Aug 10 | Sep 10 | Oct 10 | Nov 10 | Dec 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| (% of sales) | 4.2% | 5.3% | 6.9% | 10.7% | 7.9% | 6.3% | 8.9% | 9.9% | 9.9% | 11.0% | 12.0% | 7.1% | |
| 4050 · Wine Sales | 71,441.54 | 89,802.37 | 117,425.18 | 182,465.65 | 134,886.10 | 107,449.04 | 151,680.56 | 169,525.33 | 169,525.33 | 187,448.78 | 205,214.88 | 120,633.15 | 1,707,419.00 |
| 4200 · Rental Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4500 · Wine Society (Wine Sales) | 0.00 | 83,200.00 | 0.00 | 99,840.00 | 0.00 | 0.00 | 0.00 | 0.00 | 133,120.00 | 0.00 | 166,400.00 | 0.00 | 482,560.00 |
| 4600 · Wine Sales Freight | 1,000.00 | 2,600.00 | 1,000.00 | 2,700.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 2,800.00 | 1,000.00 | 2,900.00 | 1,000.00 | 19,000.00 |
| 4650 · Freight Allowance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 4700 · Sales Discounts | -3,301.86 | -4,150.46 | -5,427.12 | -8,433.14 | -6,234.13 | -4,966.04 | -7,010.33 | -7,835.07 | -7,835.07 | -8,659.82 | -9,484.56 | -5,575.39 | -78,913.00 |
| 4800 · Tasting Fees | 3,000.00 | 3,000.00 | 3,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 75,000.00 |
| **Total Income** | 72,139.72 | 174,451.96 | 115,998.13 | 280,572.61 | 133,652.05 | 107,482.81 | 153,670.32 | 170,690.36 | 305,610.36 | 189,710.40 | 375,030.44 | 126,057.84 | 2,205,067.00 |
| **Gross Profit** | 72,139.72 | 174,451.96 | 115,998.13 | 280,572.61 | 133,652.05 | 107,482.81 | 153,670.32 | 170,690.36 | 305,610.36 | 189,710.40 | 375,030.44 | 126,057.84 | 2,205,067.00 |
| **Expense** | | | | | | | | | | | | | |
| 5100 · Auto Expenses | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 5,400.00 |
| 5300 · Advertising | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,000.00 |
| 5200 · Bank Charges | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 4,800.00 |
| 5210 · Bill Backs | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 4,750.00 | 57,000.00 |
| 5250 · Tasting Room Over/Short | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5400 · Dues & Subscriptions | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 325.00 | 3,900.00 |
| 5450 · Employee HSA Benefit | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 3,900.00 | 46,800.00 |
| 5800 · Insurance | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 900.00 |
| 5810 · Late Fees & Finance Charges | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 5850 · Licenses & Fees | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 1,125.00 | 13,500.00 |
| 5900 · Meals & Entertainment | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 27,000.00 |
| 5910 · Merchant Fees | 2,885.59 | 6,978.08 | 4,639.93 | 11,222.90 | 5,346.08 | 4,299.31 | 6,146.81 | 6,827.61 | 12,224.41 | 7,588.42 | 15,001.22 | 5,042.31 | 88,202.00 |
| 5950 · Maintenance & Repairs | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 7,200.00 |
| 6000 · Office Supplies | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 90.00 | 1,080.00 |
| 6100 · Operating Supplies | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 625.00 | 7,500.00 |
| 6110 · Outside Services | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 2,925.00 | 35,100.00 |
| 6115 · Petty Cash | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 1,800.00 |
| 6120 · Postage and Delivery | 1,050.00 | 1,050.00 | 1,050.00 | 5,000.00 | 5,000.00 | 5,000.00 | 1,050.00 | 1,050.00 | 1,050.00 | 5,000.00 | 5,000.00 | 5,000.00 | 36,300.00 |
| 6560 · Payroll Expenses | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 384,000.00 |
| 6565 · Payroll Taxes | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 2,240.00 | 26,880.00 |
| 6600 · Professional Services | 5,000.00 | 5,000.00 | 5,000.00 | 7,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 62,000.00 |
| 6650 · Excise Tax | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,000.00 |
| 6725 · Rent | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 2,400.00 |
| 6750 · Rental Equipment | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 2,850.00 |
| 6782 · Tasting Room Supplies | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,000.00 |
| 6783 · Telephone | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 8,100.00 |
| 6780 · Travel | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 7,200.00 |
| 6800 · Utilities | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 2,975.00 | 35,700.00 |
| 7000 · Vineyard Expenses - Demetria | | | | | | | | | | | | | |
| 598 · Overhead | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 120,000.00 |

EXHIBIT B Page 29

3:08 PM
08/03/09
Cash Basis

Ops Proforma 2009 2010

## DAZ Vineyards, LLC
## Operating Proforma
### January 1 through December 31, 2010

| | Jan 10 | Feb 10 | Mar 10 | Apr 10 | May 10 | Jun 10 | Jul 10 | Aug 10 | Sep 10 | Oct 10 | Nov 10 | Dec 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 599 · Vineyard Labor | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 4,500.00 | 7,000.00 | 7,000.00 | 3,500.00 | 3,500.00 | 50,000.00 |
| 780 · Hand Harvest | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,000.00 | 5,000.00 | 0.00 | 0.00 | 10,000.00 |
| Total 7000 · Vineyard Expenses - Den | 13,500.00 | 13,500.00 | 13,500.00 | 13,500.00 | 13,500.00 | 13,500.00 | 13,500.00 | 14,500.00 | 22,000.00 | 22,000.00 | 13,500.00 | 13,500.00 | 180,000.00 |
| Total Expense | 80,190.59 | 84,283.08 | 81,944.93 | 94,477.90 | 86,601.08 | 85,554.31 | 83,451.81 | 85,132.61 | 98,379.41 | 97,693.42 | 96,606.22 | 89,297.31 | 1,063,612.68 |
| Net Ordinary Income | -8,050.87 | 90,168.88 | 34,053.20 | 186,094.71 | 47,050.97 | 21,928.49 | 70,218.51 | 85,557.75 | 207,230.95 | 92,016.98 | 278,424.22 | 36,760.52 | 1,141,454.32 |
| Other Income/Expense | | | | | | | | | | | | | |
| Other Income | | | | | | | | | | | | | |
| 9600 · Suspense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Other Income | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Other Expense | | | | | | | | | | | | | |
| 9500 · Interest Expense | 153,000.00 | 0.00 | 0.00 | 153,000.00 | 0.00 | 0.00 | 153,000.00 | 0.00 | 0.00 | 153,000.00 | 0.00 | 0.00 | 612,000.00 |
| Total Other Expense | 153,000.00 | 0.00 | 0.00 | 153,000.00 | 0.00 | 0.00 | 153,000.00 | 0.00 | 0.00 | 153,000.00 | 0.00 | 0.00 | 612,000.00 |
| Net Other Income | -153,000.00 | 0.00 | 0.00 | -153,000.00 | 0.00 | 0.00 | -153,000.00 | 0.00 | 0.00 | -153,000.00 | 0.00 | 0.00 | -612,000.00 |
| Net Income | -161,050.87 | 90,168.88 | 34,053.20 | 33,094.71 | 47,050.97 | 21,928.49 | -82,781.49 | 85,557.75 | 207,230.95 | -60,983.02 | 278,424.22 | 36,760.52 | 529,454.32 |

279888.68

EXHIBIT B Page 30

| | |
|---|---|
| In re:<br>DAZ Vineyards, LLC<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 9:09-bk-10689-RR |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1114 State Street, Suite 200, Santa Barbara, CA 93101

A true and correct copy of the foregoing document described **MOTION FOR USE OF CASH COLLATERAL**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On 02/16/10 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Office of the U.S. Trustee- ustpregion16.nd.ecf@usdoj.gov


II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On 02/16/10 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

SILICON VALLEY BANK
3700 OLD REDWOOD HIGHWAY
SUITE 200
SANTA ROSA, CA 95403

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on 02/16/10 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

      **Judge's Copy:**
      Honorable Robin Riblet
      United States Bankruptcy Court
      Central District of California
      1415 State Street
      Santa Barbara, CA 93101

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| 02/16/10 | Natalie A. Spilborghs | |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                                    **F 9013-3.1**